

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

January 24, 2021

**BY ECF**

The Honorable Cathy Seibel
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

    Re:    *United States* v. *Robert Courtright*, 20 Cr. 531 (CS)

Dear Judge Seibel:

    The Government respectfully submits this letter in connection with the sentencing of the defendant, Robert Courtright, which is scheduled for January 27, 2021, and in response to the defendant's sentencing memorandum ("Def. Mem."). For the reasons set forth below, the Government submits that a sentence above the stipulated Guidelines range of 10 to 16 months' imprisonment is warranted in this case.

    **A. Background**

    The defendant has a long history of criminal behavior and domestic violence. In 1996, the defendant was convicted of theft by deception, a felony, and sentenced to two years of probation. PSR ¶ 41. In 1998, the defendant was arrested for terroristic threats and harassment; he was convicted of harassment in 1999 and sentenced to one year of probation. PSR ¶ 42; Pretrial Services Report at 3. In 2001 and again in 2005, he was convicted of possession of a controlled dangerous substance and, on both occasions, sentenced to a fine. PSR ¶¶ 43-44.

    In 2005, when defendant was 30 years' old, he was convicted of simple assault in connection with an assault on his then-girlfriend, who was 10 weeks' pregnant at the time. PSR ¶ 45. According to the arrest report, defendant and his girlfriend had an argument, he followed her into a laundry room and threw chewing tobacco at her and began advancing on her, she struck him with a plastic hanger in an attempt to get him away from her, and he then punched her in the face, causing her to fall to the ground. PSR ¶ 45. She then went to her car to leave, and the defendant followed her so that he could retrieve his guns, which he was keeping in her trunk. After she contacted police, the officers observed that her face was red and swollen as a result of the assault, and she was transported to the hospital to be treated. When the officers attempted to arrest the defendant later that day, he resisted arrest, failed to comply with police commands, raised his hand in an aggressive manner toward an officer, and had to be wrestled to the ground and

restrained. The defendant was convicted of simple assault in September 2005 and sentenced to 8 days' to 23 and a half months' imprisonment, plus a term of parole. He was given credit for 8 days already served and immediately placed on parole. PSR ¶ 45.

Approximately 8 months later, in or about May 2006, the defendant violated his parole conditions and a warrant was issued for his arrest. PSR ¶ 45. Probation officers attempted to arrest the defendant, a vehicle pursuit ensued, and the defendant escaped. PSR ¶ 45. He then hid in a wooded area with a rifle. PSR ¶ 45. The defendant planned to have his then-girlfriend and mother help him flee. PSR ¶ 45. The defendant's probation officer "advised police officers the defendant has extremely violent tendencies and threatened to shoot any officers that attempted to take him into custody." PSR ¶ 45. When defendant's mother came to pick him up, the defendant emerged from the woods and began to approach her car. PSR ¶ 45. Police officers then ordered the defendant to the ground, but the defendant refused to cooperate, walked away, and was pepper-sprayed and apprehended. PSR ¶ 45. The defendant admitted that the rifle was hidden in the woods, and the rifle was recovered by police. PSR ¶ 45. On June 8, 2006, the defendant's term of parole was revoked, and he was remanded for almost 23 months, until May 2, 2008. PSR ¶ 45; Dkt. No. 29.

In 2009, the defendant was charged with "communicating threats." PSR ¶ 51. The case was dismissed in 2010. PSR ¶ 51.

In November 2012, following a hearing (which the defendant received notice of and an opportunity to participate in), a New Jersey court issued an order finding that the defendant had committed an act of domestic violence against a former girlfriend and restraining him from assaulting, threatening, or stalking her. PSR ¶ 8. The order also found good cause to believe that the defendant poses a danger to the former girlfriend's life, health, or well-being. PSR ¶ 8. Due to this order of protection, which is still in place, the defendant is prohibited from possessing a firearm or ammunition. PSR ¶ 8. In December 2012, the defendant was arrested for (though not convicted of) simple assault. PSR ¶ 52.

The defendant married his wife in 2014. PSR ¶ 59. Since 2018, the defendant and his wife have been involved in a number of domestic disputes at the home where they lived together. On February 21, 2018, police officers responded to a report of a domestic dispute involving a firearm. PSR ¶ 48. Upon arrival, an officer observed the defendant through a window of the house. PSR ¶ 48. While walking around the perimeter of the home, officers discovered that the defendant had left the home through a window. PSR ¶ 48. Officers observed a firearm through the window. PSR ¶ 48. They then heard the defendant's wife, who was at the neighbor's home, stating that she was the victim and her husband "didn't like cops." PSR ¶ 48. The wife further stated that the defendant had "turned a rifle" on her. PSR ¶¶ 9, 48.[1]

---

[1] As described in the PSR, the wife told Probation, on January 20, 2021, that "her husband never threatened her with a gun, adding that 'they' (referring to the police) 'just put anything' in the incident reports." PSR ¶ 60.

Hon. Cathy Seibel  Page 3
January 24, 2021

The next day, February 22, 2018, the wife was arrested for menacing in the second degree. This arrest appears to arise from an incident in which the wife attempted to hit the defendant with an airsoft gun. The defendant claimed that the airsoft gun went off during the fight, which apparently resulted in the wife's arrest. On February 24, 2018, the wife was given permission by a state court to enter the home with a police escort and obtain her personal belongings, which she did. PSR ¶ 48. The defendant was present while his wife and the police escort were in the home, and he was advised that a temporary order of protection was in effect. PSR ¶ 48.

In April 2018, the defendant's wife called 911 to report a dispute between her and the defendant. PSR ¶ 48. The wife reported that the defendant was extremely upset, that he kneed her in the groin, and that he threw her car keys outside the home so that she would leave. PSR ¶ 48.

In July 2018, the wife told police that she wanted to go back to her house and obtain the rest of her belongings, but that she was afraid that the defendant would be there. PSR ¶ 48. She stated that the defendant had threatened her life and to take his own life. PSR ¶ 48. She also explained that she was worried the defendant would hurt her due to the many text messages she had received from him that day. PSR ¶ 48.

On September 29, 2019, police responded to another reported domestic violence incident at the home. PSR ¶ 48. The wife stated that the defendant yelled at her regarding a vehicle being locked. PSR ¶ 48. Upon arrival, officers separated the couple and ordered the defendant to leave the home. PSR ¶ 48. The wife stated to the officers that "this occurs often," and the officers provided her with contact information for the Orange County Family Court. PSR ¶ 48.

On October 1, 2019, the wife submitted a petition for an order of protection with the Orange County Family Court. In her signed statement (attached as Exhibit A), the wife (petitioner) said the following about the defendant (respondent), among other things:

- "PETITIONER STATES THAT THE RESPONDENT HAS A VERY ABUSIVE PAST CONCERNING HER AND HE IS PHYSICALLY AND VERBALLY ABUSIVE WITH HER."

- "PETITIONER STATES THAT ON (9/29/19) THE RESPONDENT WOKE HER UP AND BEGAN SCREAMING AT HER CALLING HER A 'STUPID FUCKING CUNT' AND ASKING HER WHY DID SHE LOCK THE TRUCK AND THAT SHE BETTER UNLOCK THE TRUCK OR HE WILL BREAK THE FUCKING WINDOWS. THE PETITIONER STATES THAT SHE WENT INTO HER POCKETBOOK TO GET THE REMOTE AND SHE UNLOCKED THE DOORS TO THE TRUCK."

- "THE PETITIONER STATES THAT SHE AND THE RESPONDENT BEGAN TO ARGUE AND THE PETITIONER STATES THAT THE RESPONDENT WAS THEN TRIGGERED AND THEN RAN UPSTAIRS AND HE THEN THREW HER UP AGAINST THE WALL AND THE RESPONDENT PUT HER

> IN A CHOKE HOLD CAUSING HER TO CHOKE ON HER MUCOUS. THE PETITIONER STATES THAT SHE WAS TRYING TO GET OUT OF THE CHOKE HOLD AND THE RESPONDENT TOLD THE PETITIONER 'TODAY IS THE DAY YOU DIE BITCH.' THE PETITIONER STATES THAT HER RIGHT EYE IS PARTIALLY RED NOW DUE TO THE TIGHT CHOKE HOLD THAT THE RESPONDENT HAD HER IN."

- "PETITIONER STATES THAT SHE WAS TRYING TO CALM THE RESPONDENT DOWN AND HE THEN LET HER OUT OF THE CHOKE HOLD BUT THEN PROCEEDED TO TELL HER THAT SHE IS A 'WORTHLESS PIECE OF SHIT' AND THAT SHE IS THE WORS[T] THING THAT EVER HAPPENED TO HIM. THE PETITIONER STATES THAT SHE RAN DOWNSTAIRS AND GRABBED HER CELLPHONE AND WENT OUTSIDE TO CALL THE POLICE."

- "THE PETITIONER STATES THAT THE RESPONDENT CONTINUED TO TALK OVER HER WHILE SHE WAS ON THE PHONE WITH 911, STATING TO HER THAT SHE BETTER TELL THE POLICE THE TRUTH THAT SHE ATTACKED HIM (THE RESPONDENT)."

- "THE PETITIONER STATES THAT THE RESPONDENT IS CONSTANTLY THREATENING HER AND IS VERY VERBALLY ABUSIVE AND CONTROLLING. THE PETITIONER STATES IN THE PAST THE RESPONDENT HAS BROKEN HER BELONGINGS, CUT THE CORD TO THE MICROWAVE, CUT THE CLOTHES DRYER CORD, BROKEN FURNITURE AND HAS DESTROYED MULTITUDE OF OTHER THINGS IN THE HOME."

- "PETITIONER STATES THAT SHE HAS TO PACIFY THE RESPONDENT AND BUY HIM THINGS BECAUSE IF SHE DOES NOT HE THEN BREAKS HER THINGS IN THE HOME."

- "THE PETITIONER STATES THAT SHE IS CONCERNED FOR HER SAFETY AND WELL BEING AND WANTS THE RESPONDENT TO REFRAIN FROM ALL ABUSIVE BEHAVIOR."

Ex. A at 2. In addition, the wife indicated that the defendant "owns or has access to guns." Ex. A at 4. A family court judge granted the wife a temporary order of protection on October 1, 2019.

The next day, October 2, 2019, law enforcement officers approached the defendant at the home and served him with an order requiring him to surrender any firearms. PSR ¶ 10. The defendant was initially uncooperative, telling officers, "you're not taking them" and "tell the judge she can kiss my ass." PSR ¶ 10. The defendant shut and locked the house door, and the law enforcement officers called for backup. PSR ¶ 10. Ultimately, the defendant complied and the officers

Hon. Cathy Seibel                                                                                                         Page 5
January 24, 2021

confiscated six firearms from the home. PSR ¶ 10. Although the defendant claims that he was "threatened" by one of the officers (*see* Def. Mem. at 6, 9), the agents in this case do not believe that to be true.

In October or November 2019, the defendant's wife told law enforcement that she wanted the restraining order against the defendant lifted, and she attempted to obtain the six confiscated firearms, stating that they belonged to her, not her husband. PSR ¶ 10. ATF records indicate that the firearms were purchased by the wife. PSR ¶ 10. On November 1, 2019, the restraining order was vacated by the family court, at the wife's request. The police nevertheless refused to return the firearms, since the defendant was prohibited from possessing them under federal law.

When the officers refused to return the guns, the defendant began calling them and demanding their return. PSR ¶ 11. The defendant was angry, vulgar, and belligerent. PSR ¶ 11; *see* Ex. B (call recordings), RC_000003.[2] At one point, the defendant stated, "I just want our fucking—I want my wife's guns back. And I want them now." PSR ¶ 11, Ex. B, RC_000003 (0:25 – 0:28). It appeared that the defendant was going to say, "our guns," before catching himself to say, "my wife's guns." PSR ¶ 11. He also stated, "This fucking bullshit of, oh well, there's a restraining order. Well if you can't convict somebody of a crime, you have no right to touch their goddam firearms in the first place." PSR ¶ 11; Ex. B, RC_000003 (1:19 – 1:32). In addition, the defendant said, "You're violating my goddam rights" (3:16) and he referred to "the store that we" (*i.e.*, his wife *and* him) bought a gun from (3:51). Ex. B, RC_000003; PSR ¶ 11; Complaint ¶ 8. The officer was polite to the defendant; in contrast, the defendant called the officer an "asshole" (2:00) and a "faggot" (4:17), called other officers "little bitches" (0:16), and referred to a female officer as "a dumb Filipino can't fucking speak English bitch" (2:30). Ex. B, RC_000003. The defendant also told the officer, "how about you fucking go sit on a dildo and enjoy yourself, faggot" (4:52). Ex. B, RC_000003.

Because the Courtrights were unable to retrieve the guns, on November 10, 2019, the defendant's wife purchased a rifle and ammunition from a Dick's Sporting Goods store in Middletown, New York. PSR ¶ 12. Surveillance footage from the store reveals that the defendant and his wife looked at firearms together with a store employee. PSR ¶ 12. The defendant and his wife both held some of the firearms, though the defendant appeared to be more actively engaged in selecting and evaluating the firearms. PSR ¶ 12. The defendant also looked at ammunition. PSR ¶ 12. The wife then purchased the same firearm and ammunition that the defendant had selected, making law enforcement suspect that the wife was making a straw purchase of the firearm and ammunition on the defendant's behalf. PSR ¶ 12.

Later that month, on November 26, 2019, the defendant's wife purchased another rifle and additional ammunition from the same Dick's Sporting Goods store. PSR ¶ 13. Again, surveillance footage shows that the defendant and his wife were in the store together and that the defendant appeared to be more actively engaged in deciding which gun to buy. Complaint ¶ 12. It appeared

---

[2] The Government will provide a disk containing the recordings to the Court.

that the defendant was much more adept at handling guns than the wife. Complaint ¶ 12. The defendant and his wife then left the gun section and the employee who was helping them. Complaint ¶ 12. Later, after a shift change in the store, which resulted in a new employee staffing the gun section, the wife returned to the gun section, with the defendant close by, and purchased the same gun and ammunition that the defendant had appeared to pick out. Complaint ¶ 12.

On May 26, 2020, the Honorable Lisa Margaret Smith signed a warrant authorizing ATF agents to search the Courtright home and one of their cars for firearms and ammunition. PSR ¶ 16. The warrant was executed on June 8, 2020 (while the defendant and his wife were not in the home). PSR ¶ 16. Contrary to the defendants' claims (*see* Def. Mem. at 1, 5-9), the agents did not conduct the search in a destructive or inappropriate manner. For example, instead of breaking down the front door, the agents entered the house through an unlocked window. And instead of breaking a car window, they retrieved the keys from the wife. According to the agents who conducted the search, they did not damage the house, the wife's laptop, or the defendant's arrows. In addition, the agents did not mistreat the defendant's dogs or lock them in an attic. The dogs were given food, water, and affection, and were happy and well cared for throughout the search.

During the search of the home, the agents found the two rifles the wife had purchased in November 2019, another loaded rifle, and over one thousand rounds of ammunition. PSR ¶ 16. All three of the rifles were found in a bedroom on the first floor of the home—two were in a safe and one (which was loaded) was on the bedroom floor. In a subsequent interview, the wife told agents that she sleeps in the bedroom on the second floor, and the defendant sleeps in the bedroom on the first floor. The agents also found ammunition in both of the Courtrights' cars. PSR ¶ 16. (The wife consented to the officers searching the car that was not included in the search warrant.)

During an interview on June 8, 2020, the wife admitted that the defendant had physically and verbally abused her for the past few years of their marriage and that, on one occasion, the defendant choked her and left bruises on her body. The wife further explained that the defendant verbally abuses her by calling her vulgar names and that he often spits on or at her. (She also admitted to attempting to hit the defendant with an airsoft rifle during a fight.) The wife stated that she is fearful of her husband at times. Finally, the wife admitted that the guns are used by the defendant to go hunting with her, that she allows him to take the guns with his friends to go hunting, that he sometimes refers to the guns as his, that he always had access to the guns in the house, and that he is the one who cleans the guns.

The agents also talked to the defendant in person on the day of the search. The defendant stated to the agents, among other things, that if they took his bow and arrows then he would come back and find them and they would not like what he would do to them, that they were lucky that they did not try to search his house while he was home because they would not be walking around, and that they did not get all his guns anyway. PSR ¶ 17.

Later that day, June 8, 2020, the defendant made a number of phone calls to law enforcement officers to express his dissatisfaction with the warrant and how it was executed. Those calls were

recorded.  During one of those calls (RC_000005), the defendant stated the following, in sum and substance, to an Orange County Sheriff's Office investigator:

- In response to the investigator stating that he just got off the phone with an ATF agent who conducted the searches and that the ATF agent would provide a phone number for the defendant to register his complaints, the defendant stated: "So you did tell her that I'm taking a hundred fucking pounds of fucking skin off her ass, right?" The investigator responded, "No, I didn't tell her that."  The defendant stated, "Dude, it's gonna happen." PSR ¶ 17; Ex. B, RC_000005 (0:29 – 0:38).

- The defendant stated, "My entire life, I've done nothing but try to follow the fucking law, and because I'm not a rich motherfucker, this is what happens.  Every fucking time.  Like right now they're saying black lives matter.  Yeah, I see that it happens to the blacks, but here's the facts.  They're fucking more boisterous than us.  Plain and simple.  Because it happens to us white folks just as much as it does to black folks.  It's just that us white folk are stupid.  And I can't take this anymore, sir.  So from now on when an injustice is done to me I'm gonna do an injustice back, plain and simple.  Plain and fucking simple.  Because if it's fair for you guys it's fair for me."  The investigator asked the defendant what he meant by that, and the defendant replied, "Well, I guess I'll have to find out who was at my house and I'm gonna go ransack their motherfucking house then, huh?"  PSR ¶ 17; Ex. B, RC_000005 (1:00 – 1:48).

- The defendant continued to explain how he has purportedly been treated unfairly over the years, referencing a previous occasion where he says he brought misconduct charges against a New Jersey judge.  He stated that, from that day forward, the New Jersey State Troopers harassed him by frequently pulling him over, bringing an "entire SWAT team" to detain him, making him sit in the cold, and threatening to hurt him.  Ex. B, RC_000005 (2:00 – 2:50).  He also claimed that law enforcement's current treatment of him was retaliation for him complaining that an officer threatened him.  Ex. B, RC_000005 (3:00 – 3:10).

- The defendant stated that he was "not taking the beating lying down anymore, so if you come to do something to me, you better come correct."  Ex. B, RC_000005 (4:42 – 4:47).

- The defendant stated, "They claim they were looking for ammo?  Then why the fuck did they leave fucking a couple hundred rounds of ammo right in plain sight, laying all over my house?  Because that's what the officer said, oh, they had to go through everything thoroughly to make sure they didn't miss any ammo.  Well then how the fuck can I walk right out of my house and walk out with 200 rounds of ammo like that?" Ex. B, RC_000005 (5:15 – 5:35).

Hon. Cathy Seibel                                                                        Page 8
January 24, 2021

- The defendant complained that the officers took his marijuana. Ex. B, RC_000005 (5:47 – 5:53). (The defendant apparently told Probation that he does not use drugs. *See* PSR ¶ 68.)

- The defendant claimed that the agents locked his dog in the attic, and stated, "You don't think somebody's getting punched in the face for that? Let me . . . . lock you in a fucking attic . . ." PSR ¶ 18; Ex. B, RC_000005 (6:35 – 6:58). He complained that the officers touched his dog, and stated, "now I'm going to touch somebody else." Ex. B, RC_000005 (7:15-7:20).

- The investigator said, "I just don't want you doing anything rash." The defendant responded, "How is it rash, sir? It's not rash, this is clear as motherfucking day, dude. You can't keep putting your foot on somebody's throat and one day tell them they're being rash." PSR ¶ 18; Ex. B, RC_000005 (9:28 – 9:44). The defendant continued, "you've been doing this to me for over 15 years," and complained about how he was treated by New Jersey police. Ex. B, RC_000005 (9:45 – 10:00).

- The investigator explained that the agents executing the search warrant recorded videos both before and after the search, and the defendant replied, "Well, then they can record me smashing them in the fucking face too. Because that's what's really gonna happen. I'm not taking this shit no more." PSR ¶ 18; Ex. B, RC_000005 (10:48 – 10:59).

- The investigator stated, "I'm hoping this whole scenario doesn't cause you to do anything that's gonna cause harm to anybody, it's not worth it." The defendant replied, "Dude, at this point it's justified." PSR ¶ 18; Ex. B, RC_000005 (11:13 – 11:20).

- The defendant explained that he was going to the news with his story, and that he had a recording of the officers because he had lied to them when he said he did not have a cell phone, and the cell phone was hidden in his underwear. Ex. B, RC_000005 (11:40 – 12:00).

- The defendant complained that the agents had surveilled him outside his home, and stated, "Well here's facts. Good goddam thing I didn't see somebody sitting there because they wouldn't be sitting there fucking—they'd be a permanent fucking fixture there. You don't have a right to violate my fucking rights. And to watch me like that? You're lucky I didn't fucking goddam know. Because I would have yanked a guy right out of his fucking car." PSR ¶ 19; Ex. B, RC_000005 (12:44 – 13:02).

- The investigator explained that he was in the process of getting the defendant a phone number, and the defendant complained about how long it was taking, and stated: "If I told you I was going to do something serious enough that it warranted it, you'd have cops here in fucking less than a fucking heartbeat." The investigator stated, "Well there's a significant difference if you're gonna pose an immediate threat to something." The

Hon. Cathy Seibel  
January 24, 2021  
Page 9

      defendant yelled, "No there's not dude, again, somebody violated my fucking rights and because there was a badge, there's nothing I can fucking do. Do you see why I'm gonna do my own?" PSR ¶ 20; Ex. B, RC_000005 (13:25 – 14:09). The defendant continued, "this is what I've been faced with my whole life. You can't be a good citizen and an honest person because all they do is shit on you." Ex. B, RC_000005 (14:15 – 14:23).

- The defendant yelled, "you took my fucking children from me. Do you think I'm going to let anything more go?" Ex. B, RC_000005 (15:43 – 15:48). He then explained that the only reason the judge signed the order in that case was because his ex-girlfriend was sleeping with the judge, and the judge knew he had to sign the illegal order because otherwise the ex-girlfriend would tell the judge's wife about the infidelity. Ex. B, RC_000005 (15:54 – 16:40). (The Government has no reason to believe this allegation is true.)

- The defendant stated: "If somebody does not come to my house by the end of the day I'm taking this in my own fucking hands. I don't care where it goes. I don't care, sir. You're not gonna kick Courtright around no more." PSR ¶ 20; Ex. B, RC_000005 (18:08 – 18:21).

- The investigator was incredibly polite to the defendant throughout the call; in contrast, the defendant called the officers "fucking scumbags" (0:46) and an "asshole" (2:53). Ex. B, RC_000005.

The same Orange County Sheriff's Office investigator had another call with the defendant later that day (RC_000001). During that call, the defendant stated, in sum and substance, the following:

- The defendant complained that he was being mistreated because he "pulled a woman thing," and explained, "you know how women go and make up fucking shit all the time." Ex. B, RC_000001 (1:15 – 1:22).

- The defendant stated that he was angry with a particular ATF agent, that the agent never wanted to see the defendant face to face again, and that the agent "better never walk the gorge." Ex. B, RC_000001 (6:53 – 7:06).

- The defendant complained about the agents who executed the warrant in his home, alleging property damage, and stated, "That's why I'm gonna break every fucking bone in their body. I know who they are. They can either come say sorry to me or I will have to fucking take this into my own hands." PSR ¶ 21; Ex. B, RC_000001 (8:25 – 8:34).

- The defendant asked, if the officers searching his home were looking for ammunition (as opposed to just retaliating against him), "then why did I walk out of my house with over 200 fucking rounds of ammo?" Ex. B, RC_000001 (9:15 – 9:22).

Hon. Cathy Seibel                                                                                                          Page 10
January 24, 2021

- The defendant stated: "Here's another thing that I can't wait to tell ATF. Because you can do whatever the fuck you want. Years ago when I had those problems with my other woman, when they gave those guns back, I have fucking bookoo guns in my fucking name. Are they in my possession right now? No. Good luck finding the friends and family who have them. But you'll never get them. Why? Because I did nothing wrong. So I don't need my wife. I've got thirteen of my own." PSR ¶ 21; Ex. B, RC_000001 (15:48 – 16:12).

- The defendant noted that he was not acting rash because he had experienced "twenty-plus years of being persecuted for no reason." Ex. B, RC_000001 (18:08 – 18:14).

Finally, also on June 8, 2020, the defendant had a telephone conversation with an ATF agent (RC_000002), in which he said, in sum and substance, the following:

- The defendant said: "If one of your agents mis-fucking-handled my dog, I'm gonna mishandle them." PSR ¶ 22; Ex. B, RC_000002 (2:07 – 2:13).

- The ATF agent asked the defendant, "Are you prohibited from possessing firearms and ammunition?" The defendant replied, "Through a bullshit restraining order that's not even legal." PSR ¶ 22; Ex. B, RC_000002 (3:42 – 3:51). The defendant yelled that it is "an unjust, illegal restraining order," that he had already proved it in court, and that "the racist, black-ass judge didn't give a fuck." Ex. B, RC_000002 (3:58 – 4:17).

- When the defendant complained about alleged property damage, the ATF agent noted, among other things, that the agents could have broken the car window, but did not, and the defendant replied, "Then I would have broke your face." PSR ¶ 23; Ex. B, RC_000002 (6:25 – 6:50).

- The defendant again complained about alleged property damage in his home and stated, "So I'm telling you, I need this rectified, or I will figure out who did it and I'll rectify it my fucking self." PSR ¶ 23; Ex. B, RC_000002 (8:25 – 8:30).

- At one point, the defendant appeared to suggest that law enforcement planted the guns and ammunition that it recovered from his home in order to retaliate against him. Ex. B, RC_000002 (9:00 – 9:30).

- The ATF agent explained that the agents executed the warrant in a manner designed to avoid the need to break down the defendant's door early in the morning with guns and put him in handcuffs, and the defendant yelled, "I would have knocked you through my door." PSR ¶ 23; Ex. B, RC_000002 (9:35 – 10:00).

- The defendant claimed that he went along with his wife to purchase the guns because she "was a new hunter and [he] wanted to make sure she got something that was fucking

>  efficient in the woods." Ex. B, RC_000002 (11:18 – 11:23). (Defendant now claims that his wife "is a lifelong hunter." Def. Mem. at 4.)

- The defendant continued, "Maybe you might want to get to know somebody before you just come and take their life apart, because I'm coming to take your guyses." PSR ¶ 23; Ex. B, RC_000002 (11:28 – 11:33).

Following these calls, the defendant never physically harmed any of the agents. However, the agents were alarmed by the threats. PSR ¶ 27.

On June 19, 2020, Judge Smith approved a complaint charging the defendant with one count of being a prohibited person in possession of firearms, in violation of 18 U.S.C. § 922(g)(8), and one count of threatening to assault federal law enforcement officers, in violation of 18 U.S.C. § 115(a)(1)(B). The agents were concerned that executing the arrest warrant at the defendant's home would lead to a dangerous confrontation, so they waited to arrest the defendant until they could conduct a car stop. They arrested the defendant during a car stop on July 6, 2020. After he was arrested, the defendant told the agents, in sum and substance, "Go fuck yourselves I am going to do something stupid."

The defendant was presented before Judge Judith C. McCarthy on July 7, 2020. Following a bail argument, Judge McCarthy ordered the defendant detained on both danger and flight risk grounds. After Judge McCarthy explained her reasoning, the defendant stated, "It's all lies. Whatever. It's good." Judge McCarthy responded, "Thank you, Mr. Courtright. You have now reinforced that I made the right decision." The defendant has been detained since July 6, 2020.

On October 29, 2020, the defendant pled guilty, pursuant to a plea agreement, to a one-count information charging him with threatening to assault federal law enforcement officers in violation of 18 U.S.C. § 115(a)(1)(B). At that time, the Government understood that the defendant had zero criminal history points and was in Criminal History Category I. This calculation was based on the understanding that the defendant's sentence for his 2005 simple assault conviction only resulted in 8 days' imprisonment—meaning that it yielded zero criminal history points, since the sentence was imposed more than ten years before the defendant commenced the instant offense. *See* U.S.S.G. § 4A1.2(e)(2)-(3). Under the plea agreement, the stipulated Guidelines range is 10 to 16 months' imprisonment, and the fine range is $5,500 to $55,000.

The final PSR was issued on January 20, 2021. The PSR makes clear that, although the defendant initially served 8 days' imprisonment for his 2005 assault, his term of parole was later revoked, and he was remanded for almost 23 months, from June 8, 2006 to May 2, 2008. PSR ¶ 45; *see also* Dkt. No. 29 (defense counsel acknowledging that the defendant "served twenty-two months for a parole violation in 2006"). Under U.S.S.G. § 4A1.2(k)(1), a revocation sentence is added to a defendant's original term of imprisonment for purposes of calculating criminal history points, meaning that Courtright's combined sentence (of approximately 23 months' imprisonment) exceeds one year and one month. As a result, the applicable time period for including this sentence in the defendant's criminal history calculation should be fifteen years, rather than ten years. *See*

U.S.S.G. § 4A1.2(e)(1). The fifteen year period is measured from "the date of last release from incarceration on such sentence," *id.* § 4A1.2(k)(2), *see also id.* § 4A1.2(e)(1), which in this case is May 2, 2008—less than fifteen years before the defendant committed the instant offense. Under U.S.S.G. § 4A1.1(a), sentences exceeding one year and one month result in three criminal history points. If three criminal history points were added to the calculations here, the defendant would be in Criminal History Category II, and his Guidelines range would be 12 to 18 months' imprisonment. Of course, the defendant anticipated that his Guidelines range would be 10 to 16 months' imprisonment when he pled guilty.

Probation recommends a sentence of 16 months' imprisonment, followed by 3 years' supervised release, and a $5,500 fine. PSR pp. 23-24.

### B. Discussion

#### 1. Applicable Law

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After that calculation, however, the Court must consider the seven factors outlined in 18 U.S.C. § 3553, which include the nature and circumstances of the offense, the individual characteristics of the defendant, the need to protect the public, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6.

#### 2. An Above Guidelines Sentence Is Reasonable in this Case

The Government respectfully submits that a sentence above the stipulated Guidelines range of 10 to 16 months' imprisonment would be fair and appropriate.

*First*, the defendant's history and characteristics justify an above-Guidelines sentence. As described above, the defendant has a history of criminal conduct. He has previously been arrested for "terroristic threats" and "communicating threats." PSR ¶ 51; Pretrial Services Report at 3. He has five prior convictions (including for simple assault, harassment, theft by deception (a felony), and drug possession). PSR ¶¶ 41-45. He violated his parole in 2006, leading to a term of imprisonment of almost 23 months. PSR ¶ 45. And it appears that the defendant has repeatedly possessed firearms and ammunition over the years, despite being a prohibited person (on account of both his prior felony and the 2012 restraining order). For example, the defendant reportedly retrieved guns from his girlfriend's trunk in 2005, hid in the woods with a rifle in 2006, had a firearm in his home in February 2018, had firearms in his home in October 2019 (before the officers confiscated them), held firearms at Dick's Sporting Goods in November 2019, had firearms and ammunition in his home from November 2019 to June 2020, had ammunition in the

family cars in June 2020, had 200 rounds of ammunition that officers purportedly missed in the search in June 2020, and, as of June 2020, still had thirteen additional guns that ATF does not know about.

The defendant also has a troubling history of domestic violence. In 2005, he reportedly punched his pregnant girlfriend in the face, sending her to the hospital. PSR ¶ 45. In 2012, a former girlfriend obtained a restraining order against the defendant, after the judge found good cause to believe the defendant committed an act of domestic violence against her, and that he poses a danger to her. PSR ¶ 8. In February 2018, the defendant's wife reported that the defendant "turned a rifle" on her, though she now says that never happened. PSR ¶¶ 9, 48, 60. In April 2018, the wife reported that the defendant kneed her in the groin. PSR ¶ 48. In July 2018, the wife told police that the defendant had threatened her life and to take his own life. PSR ¶ 48. In October 2019, the wife submitted a signed statement to Orange County Family Court, in which she explained, among other things: (1) that the defendant is physically and verbally abusive to her and constantly threatens her; (2) that on September 29, 2019, he threw her against a wall, put her in a tight choke hold (causing her eye to turn red afterward), and told her "TODAY IS THE DAY YOU DIE BITCH"; (3) that he breaks her belongings; (4) that she is concerned for her safety; and (5) that he owns or has access to guns. Ex. A.

The defendant's history also makes clear that he does not respect the authority of law enforcement and the judicial system. For example, in 2005, when officers tried to arrest the defendant for punching his pregnant girlfriend, he resisted arrest, aggressively raised his hand toward an officer, and had to be wrestled to the ground and restrained. After the defendant violated parole, in 2006, he hid from police in a wooded area with a rifle, and planned to flee with the help of his family. PSR ¶ 45. When police tried to arrest him, he refused to cooperate and had to be pepper-sprayed. PSR ¶ 45. In October 2019, when police served the defendant with an order to surrender firearms, he initially refused and stated, "tell the judge she can kiss my ass." PSR ¶ 10. And at the bail hearing in this very case, the defendant told Judge McCarthy that what she had said was "all lies."

Finally, unlike many defendants who are before Your Honor, the defendant was raised by a stable family and "enjoyed his childhood," which was free from any type of abuse. PSR ¶¶ 54-57. Nevertheless, based on the defendant's statements to law enforcement, he appears to blame everyone but himself (including the police, judges, and ex-girlfriends) for his problems. *See, e.g.*, Ex. B, RC_000005 (1:00 – 1:48) ("My entire life, I've done nothing but try to follow the fucking law, and because I'm not a rich motherfucker, this is what happens."); Ex. B, RC_000005 (2:00 – 2:50) (claiming that New Jersey police retaliated against him for criticizing a judge); Ex. B, RC_000005 (15:54 – 16:40) (claiming that the judge signed an order taking away his children because his ex-girlfriend was sleeping with the judge); Ex. B, RC_000001 (1:15 – 1:22) ("you know how women go and make up fucking shit all the time"); Ex. B, RC_000001 (18:08 – 18:14) (stating that he had experienced "twenty-plus years of being persecuted for no reason"); Ex. B, RC_000002 (9:00 – 9:30) (suggesting law enforcement officers planted guns and ammunition in his house).

Hon. Cathy Seibel								Page 14
January 24, 2021

*Second*, an above-Guidelines sentence is justified to reflect the seriousness of the offense, provide just punishment, and promote respect for the law.  The defendant's conduct here—repeatedly threatening federal law enforcement agents—is incredibly serious.  As discussed above, the defendant stated, among other things: that he was going to "tak[e] a hundred fucking pounds of skin off [a female agent's] ass"; that he would "do an injustice back"; that he would "find out who was at [his] house and . . . go ransack their motherfucking house"; that somebody was "getting punched in the face"; that the agents "can record me smashing them in the fucking face" "because that's what's really gonna happen"; that doing something to "cause harm to anybody" would be "justified" at this point; that if he had known that officers were watching his house "they'd be a permanent fucking fixture there" and he "would have yanked a guy right out of his fucking car"; that he was "taking this in [his] own fucking hands" and did not "care where it goes"; that he was going to "break every fucking bone" in the bodies of the agents who conducted the search; that he was going to "mishandle" the agents; that if an agent had broken a car window he "would have broke [his] face"; and that if the agents had come to his home to arrest him, he "would have knocked [them] through [his] door."  PSR ¶¶ 17-23.  Although the defendant never acted on these threats, the agents were understandably alarmed by them.  PSR ¶ 27.

*Third*, an above-Guidelines sentence is necessary to protect the public—particularly law enforcement officers and the defendant's wife.  There is a serious risk that the defendant will carry out the threats he made to law enforcement.  The defendant appears to have a chip on his shoulder and believe that he has repeatedly been victimized, particularly by law enforcement.  He clearly loathes law enforcement officers, thinks they are out to get him, and does not respect their authority.  He thinks he has been wronged by law enforcement for decades, and he has vowed to take things into his own hands.  He believes the search of his home was illegitimate and is furious with the agents who conducted the search.  He has demonstrated that he has problems with anger management and impulse control.  He has a history of violence with romantic partners and a history of resisting the police.  He claims that he still has access to thirteen guns, and he appears willing to use straw purchasers to obtain more.  And he is an experienced hunter who is apparently well-versed in how to use a gun.  Under these circumstances, there is a major risk that the defendant will act on his threats.

Likewise, there is a significant risk that the defendant's release will put his wife in danger.  The defendant and his wife plan to live together again following his release.  PSR ¶ 60.  Given that, as discussed above, the defendant has apparently attacked and threatened his wife on numerous occasions in the past, there is a substantial risk that he will do it again upon release.  To be sure, the wife supports the defendant and wants him to come home.  But, as Your Honor knows, it is not uncommon for victims of spousal abuse to express support for their abusers.  In order to protect the defendant's wife, along with law enforcement agents, the Court should impose a sentence longer than 16 months' imprisonment.

*Fourth*, the compelling need for both specific and general deterrence justifies an above-Guidelines sentence.  The prior consequences that the defendant has faced for his actions—including his time in prison, the orders of protection, and the loss of his right to possess firearms—were clearly insufficient to deter him from committing additional crimes.  The Court should

Hon. Cathy SeibelPage 15
January 24, 2021

impose a sentence that, unlike the defendant's prior punishments, ensures that he does not make these types of choices again. Moreover, an above-Guidelines sentence would provide general deterrence by making clear to others, who might consider threatening or harming law enforcement officers, that the courts take officer safety incredibly seriously and that threats to law enforcement can result in meaningful terms of incarceration.

### C. Conclusion

For the reasons set forth above, a sentence above the stipulated Guidelines range of 10 to 16 months' imprisonment would be fair and appropriate in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By:__/s/_____
Jim Ligtenberg
Assistant United States Attorney
(914) 993-1953

cc:Ben Gold, Esq. (by ECF)